MARY D. FRICK AND REBECCA C. D. WARFIELD *vs.*
CHARLES C. DENISON AND JASPER M.
BERRY, JR., EXECUTORS OF ROB-
ERT M. DENISON, DECEASED.

*Executors: administrators; erroneous accounts; restatement;
counsel fees.*

In stating a first administration account the executors made
various errors and omissions, and upon the objection of cer-
tain of the legatees they were compelled to restate another
first administration account; *held,* that under the facts of the
case the Orphans' Court should not have authorized the exec-
utors to employ and pay counsel out of the estate for the
purpose of aiding them in stating the account.     p. 305

*Decided June 24th, 1911.*

Appeal from the Orphans' Court of Baltimore County.

The cause was argued before BOYD, C. J., PEARCE, BURKE,
URNER and STOCKBRIDGE, JJ.

*William H. Buck* and *C. Baker Clotworthy,* for the appel-
lants.

*Osborne I. Yellott,* for the appellees.

PEARCE, J., delivered the opinion of the Court.

This is an appeal from an order of the Orphans' Court of
Baltimore County authorizing Charles C. Denison and Jas-
per M. Berry, Jr., executors of Robert M. Denison, deceased,
"to employ Osborne I. Yellott as their counsel to aid them in
stating a new first administration account and in the further
administration of said estate, * * * and to pay to said

Osborne I. Yellott out of the assets of the estate, the sum of three hundred dollars, the same to be in full compensation for all services heretofore rendered by him to the executors in their capacity as such, and to cover, as well, all services which may be hereafter rendered by him in the preparation of the new first administration account which the Court has this day on another petition of said executors, ordered to be stated."

In order to a proper understanding of the merits of this appeal, it will be necessary to state somewhat in detail the character of the administration and the particular features of the settlement of the estate which have led to this controversy as to the allowance out of the estate of this counsel fee to the executors.

Robert M. Denison died in April, 1909, possessed of a handsome real and personal estate, and leaving a last will and testament by which he devised and bequeathed to his two sons, Robert M. Denison, Jr., and Charles C. Denison as joint tenants a certain farm in Baltimore county with all the personal effects thereon, and to his two daughters, Mrs. Mary C. D. Frick and Mrs. Rebecca C. D. Warfield, as tenants in common, three parcels of land in Baltimore City, and the whole residue of his estate real and personal to his said four children, share and share alike, they being his only heirs at law, and his wife having predeceased him. He directed in his will, however, or expressed his wish, that none of the property devised or bequeathed by the residuary clause should be disposed of before January 1st, 1914, without the consent of each of said children, and he appointed Charles C. Denison and Jasper M. Berry, as his executors.

This will was admitted to probate April 27th, 1909, letters testamentary were granted same day, and on the same day also, an agreement under seal between the said four children was filed with the will, that in the distribution to be made of said personal estate after payment of debts and expenses, one-fourth part thereof should be distributed to each child and

that the real estate should be appraised as therein provided, and divided into four equal parts, and that one-fourth part thereof as so divided, should by interchange of conveyances, be vested in each child in such manner as he or she should designate, and the executors assented in writing to the carrying out of said agreement. The deceased had a large and valuable real estate in Baltimore City, and also had a farm in Queen Anne's county and several farms in Baltimore county and also in Anne Arundel county.

In 1886 the real estate firm of J. M. Berry & Son, of which Jasper M. Berry, Jr., was a member, took charge of the collection of the rents of the Baltimore City property, except one parcel, and since the dissolution of that firm by the death of the senior member in 1906, Jasper M. Berry, Jr., has conducted the business under the firm name and continued to collect said rents up to the death of Mr. Denison.

Charles C. Denison for about five or six years before his father's death, acting under a power of attorney from him, had charge of the real estate other than that in Baltimore and collected and accounted for the rents therefrom.

On April 19th, 1910, the executors presented to the Orphans' Court an account which they intended and believed to be a correct and final administration account, and which was passed by the Court on that day, showing aggregate receipts of over $180,000, and a balance for distribution of over $147,000, accompanied by a distribution to each of the four children of $36,857.22, which distribution was ordered by the Court, and the executors were ordered to grant and convey to the respective distributees the several leasehold properties included in the said distribution.

Releases were prepared at the same time by Mr. D. H. Emory, who had been employed by an agreement of all the parties, and these were presented for execution. Robert M. Denison, Jr., executed his release, it being understood that certain small errors in the account were to be adjusted without restating the account, and desired the distribution made

at once, and the executors were also desirous of making immediate distribution, but desired the releases to be concurrently delivered, the above-mentioned small errors to be adjusted at the same time. The administration account did not in terms purport to be a final account, though supposed by the executors to be a complete administration of the estate, subject to the correction of said small errors, and the releases tendered for execution exonerated the executors from any suit or demand "for or on account of the said sum of money paid as aforesaid, and the distribution as aforesaid." On May 14th, Col. Clotworthy wrote the executors that he had been retained by Mrs. Frick and Mrs. Warfield to examine the administration account, and he specified certain matters to which he objected, and in regard to which he desired information. These matters were as follows:

1. Receipts from board of horses at the home farm, which were thought to be too small.

2. An amount of $642.51 as received from J. M. Berry & Son, representing collections of rents. This was thought to be too small, and a *general statement* of the accounts was desired relating to these rents *during the existence of the agency.*

3. That commissions were erroneously allowed to the executors on $2,025 representing items in which the decedent had only a life estate; also on $4,720, representing an error in carrying out the appraised value of certain securities, aggregating $134.90.

4. Amount paid for servants' wages, $135, supposed to be inadvertently allowed after the death of Mr. Denison.

5. Mr. Emory's fee of $1,000, which it was objected should not be allowed out of the estate.

6. An allowance of $5,213.30 to the National Marine Bank, thought to require explanation in view of Mr. Denison's large means.

7. An inquiry as to a quantity of barley which he was informed had been sold but not accounted for.

. Mr. Berry replied, on May 20th, that the items for horse board included all of which he had any information; he explained that four days previous to the death of Mr. Denison J. M. Berry & Son paid out $1,510. 92 on account of Burnt District benefits to certain property of Mr. Denison thus materially reducing the amount in their hands. He conceded the error in commissions offering to correct it by checks to each party for a proportionate amount. He replied that no wages were paid servants after Mr. Denison's death. Explained that Mr. Emory's employment was under an agreement between the heirs filed in Court and providing for its payment out of the estate. Explained that the claim of the Marine Bank was for a note representing a loan to Mr. Denison duly proved by the officers of the bank, and that his information was that all the barley had been fed to the stock.

On May 19th Gen. Warfield wrote Mr. Berry inquiring if partial releases could not be accepted so that the leasehold property could be turned over pending the arrangement of other matters, and on the 20th, Mr. Berry replied that in view of Col. Clotworthy's communication they deemed it best for all concerned that the distribution when made should be final, and on the 24th of June wrote General Warfield that he had concluded it was best for all concerned that Col. Clotworthy's office should take up with Mr. Yellott *as their counsel* all matters arising out of said administration, to which General Warfield acceded by letter of June 27th, 1910. From this date down to January 16th, 1911, the matter drifted along in correspondence, when Messrs. Lemmon and Clotworthy wrote the executors that unless distribution was made by the 23rd inst., they would be compelled to take such action as they should deem advisable. In the meantime the executors had furnished Col. Clotworthy's office with a copy of all the accounts between 1906, the date of the dissolution of the firm of J. M. Berry & Son, and the death of Mr. Denison in 1909; with an itemized account of the board of horses; with cancelled checks on National Marine Bank and seven books of check stubs from 1902; also with a statement

of barley since ascertained to have been sold, amounting to $93.60 and constituting an error to that extent.

In the letter of January 13th, 1911, complaint is made that Messrs. Lemmon and Clotworthy are not satisfied with "certain items in the account filed—particularly the item of $642.51 as paid by J. M. Berry & Son—also receipts from board of horses and barley." No mention was made in that letter of any other disputed items mentioned in the letter of May 14th, and it would seem from that fact, and from the absence of any allusion in the testimony to the other items in the letter of May 14th, that those objections were abandoned. The letter of January 13th, however, does say that they contend "the estate should be larger" and it does appear from the testimony of Mr. Buck of the firm of Lemmon and Clotworthy that there has been discovered an item of $309.92 in the accounts with J. M. Berry & Son which is charged against Mr. Denison when it should have been credited to him, thus making a difference of $619.84 against Mr. Denisons estate.

The executors conceded the error of $134.90 in the commissions, and of $93.60 for barley sold, and offered to settle these items by checks for one-fourth of the total amount to Mrs. Frick and Mrs. Warfield upon execution and delivery of the releases prepared, but this was refused because General Warfield states that Mr. Berry told him he would consider the releases to be full and final and to preclude taking up other matters objected to and disputed by the executors.

Upon receipt of the letter of Messrs. Lemmon and Clotworthy of January 13th, 1911, Mr. Yellott replied submitting alternative propositions for settlement of the matters in dispute.

(1) By adjustment of the same amicably in a supplementary account, distributions to be made concurrently under both accounts, upon execution and delivery of full releases.

(2) By filing a petition for the rescission of the account passed, on account of certain conceded errors, and the stating of a new account and distribution thereunder, but retain-

ing a cash sum sufficient to protect the executors in event of continued litigation.

(3) Submission of all questions to the Orphans Court as arbitrators.

The appellants accepted the second proposition and on January 26th the executors filed a petition accordingly conforming to the agreement of the parties, reciting the employment of Mr. Yellott by the executors, as counsel to aid them in closing up the estate; stating their view of the existing situation, and the services already performed, and further to be performed by Mr. Yellott in the matter, and praying for authority to employ Mr. Yellott to assist them "in preparing a new administration account *and to direct and advise them in obtaining accountings from J. M. Berry & Son and Charles C. Denison individually,* and to authorize them to pay him reasonable compensation for such services, accompanying this petition was a certificate of Messrs. D. H. Emory and Edwin J. Farber, members of the Bar, to the effect that from their knowledge of the character of the services rendered and to be rendered by Mr. Yellott in the matter, $500 would be a reasonable compensation therefor. Robert M. Denison, Jr., answered saying that he regarded the account stated as fair and just with the exception of certain minor inadvertent items which were proposed to be and should be adjusted without the expense of a new account, but that if an adjustment could not be reached without a new account he believed that the expense of counsel was a proper charge against the estate; but objected to the payment out of his share of the estate for any lengthy investigation of accounts between the estate and J. M. Berry & Son and Charles C. Denison individually.

Mrs. Frick and Mrs. Warfield answered setting forth their dissatisfaction with the accounting between the executors and J. M. Berry & Son; alleging that the necessity of a new account was due solely to errors of the executors which should not be corrected at the expense of the distributees, and alleging that the services performed or to be performed by

Mr. Yellott are for and on behalf of Charles C. Denison and Jasper M. Berry, Jr., to the compensation for which the distributees should not be made liable.

Thereupon, and upon the testimony taken the order was passed from which this appeal was taken.

There is nowhere in this record any charge or imputation of wrongdoing or bad faith on the part of Messrs. Denison and Berry, or either of them, either in their respective individual accounts with Mr. Robert M. Denison during his life, or in the stating of their administration account. There is, however, evidence of several conceded errors against the estate, not known to the executors until discovered by the appellants upon examination of the administration account.

Mr. Buck who examined such papers and statements as were submitted by Mr. Berry in reference to his individual accounts with the deceased, testified that he found in these numerous errors in addition, and a single charge of $309.62 against the estate which should have been a credit to the estate, and Mr. Berry was not called to deny or explain any of these alleged errors. The evidence is that from 1886 to Mr. Denison's death in 1909, when he was far advanced in years, his annual rentals passing through Mr. Berry's hands were about $15,000, a transaction alone which demanded careful and accurate book-keeping, and there is no evidence that his books or accounts were destroyed by fire or lost otherwise; though it does appear that he had not preserved these books and accounts.

Mr. Charles C. Denison had charge of his father's affairs for a number of years before his death, just how many does not appear in proof, under a power of attorney drawn by Mr. Berry, but there is nothing to show what accounts he kept of his receipts from Mr. Berry or from any other source. There is evidence, however, that Mr. Charles C. Denison stated to these appellants in 1908, before his father's death, that as such agent he had received no detailed statement of these rents since 1904 and that he was then warned of possible future trouble by reason of that fact, and that he co-oper-

ated with Gen. Warfield in an effort to secure such a statement from Mr. Berry, but without success.

The administration account when prepared showed that that account, of which no statement had been rendered for five years, was closed by a single entry of a sum of $624.51 among "accounts paid," without any explanation that it represented a balance due on that rental account, or how that sum was ascertained to be the amount due to close the account.

. When attention was called to the small amount of that item, as compared with the regular annual or monthly receipts, the only explanation given was that the amount in hand had been reduced, only a few days before Mr. Denison's death, by the payment of benefits on property in the Burnt District, but that was obviously no adequate explanation of the application of large amounts through a period of several years.

Mr. Denison did not testify at all, though he was in charge of his father's financial affairs for a number of years, and Mr. Berry was not called in rebuttal of any testimony given by Mr. Buck or Gen. Warfield, or to show that there was no occasion or reason for inquiry into these accounts. It is true that it would not have been appropriate to embody in the administration account itemized accounts running through a series of years, but all the information that existed as to the basis of accounting between J. M. Berry & Son and Charles C. Denison as the agent of his father, was in the possession of those gentlemen, one or both of them, and we think it is obvious that the appellants had a right to demand the exhibition to them of all the sources of information open to either Mr. Berry or Mr. Charles C. Denison, none of these sources being accessible to the appellants. If these sources of information were imperfect, either through the neglect or misfortune of those who were charged with the duty of so keeping those accounts that they should show the true state from time to time, upon demand made, that could

not alter the rights and duties of the respective parties to this controversy.

It is quite clear that Mr. Yellott was called into this case as counsel for Messrs. Denison & Berry in a controversy with the appellants relating almost exclusively to their own individual accounts with the estate of the decedent, and that in that respect there interests were adverse to those of the appellants. It is equally clear that Messrs. Lemmon and Clotworthy came into the case as counsel for the appellants seeking to enforce a demand against the appellees. There was between them a plain conflict of interest, and this conflict was the same after as before the passage of the order appealed from. The appellants were in no way responsible either for the errors existing in the account stated, or for the difficulties encountered by the executors in explaining their individual accounts with the estate, and we are unable to perceive upon what just principle the appellants can be required to contribute to the compensation of counsel whose original employment was confessedly adverse to the interests of the appellants, and whose further employment under the order of the Orphans' Court is to enable Messrs. Berry and Denison in their individual capacities to state and exhibit an accounting which they were under obligations to render to the representatives of the estate whoever they might be. The fact that they themselves were the executors could not alter the situation and their obligation to render an account, was the same as if the appellants had been appointed as executors. It may be that the services of counsel are necessary to enable them to do this, but that is no fault of the appellants and does not justify the imposition of any part of the costs of those services upon those who are entitled to the accounting.

We do not question the value of Mr. Yellott's services which have doubtless been arduous, nor the measure of his compensation, which appears to be reasonable. The only question with which we are concerned is by whom they should be paid. We are not here considering whether a new admin-

istration account will result in increasing the amount for distribution, but at whose expense that investigation shall be conducted, as the situation is now made to appear.

We are not to be understood as determining that the Orphans'. Court has in no case the power to allow counsel fees to executors or administrators in estates involving intricate and difficult questions of accounting between an estate and third parties, or even with the executors or administrators themselves, nor that they can only allow such fees for the literal "recovery or security of some part of the estate." That question may properly be reserved until it actually arises; but if it should be conceded, *ex gratia,* that such power does exist, we are of opinion that the exercise of the power could not be justified in the existing situation.

> *Order reversed in so far as the same directs the payment of any counsel fee to the executors out of the assets of the estate, and case remanded for such further proceedings in the statement of the new administration ordered by the Orphans' Court, as said Court shall deem proper; the costs of this appeal to be allowed out of the estate.*